## ABERDEEN & ROCKFISH RAILROAD CO. ET AL. *v.* STUDENTS CHALLENGING REGULATORY AGENCY PROCEDURES (SCRAP) ET AL.

No. A–72.   Decided July 19, 1972*

See: 346 F. Supp. 189.

MR. CHIEF JUSTICE BURGER, Circuit Justice.

These applications request me, as Circuit Justice for the District of Columbia Circuit, to stay a preliminary injunction entered by a three-judge United States District Court for the District of Columbia. The applicants are the Interstate Commerce Commission and a long list of railroad companies composing most of the rail transport in the Nation. Opposing the applications are the plaintiffs below, Students Challenging Regula-

---

*Together with No. A–73, *Interstate Commerce Commission* v. *Students Challenging Regulatory Agency Procedures (SCRAP) et al.*, also on application for stay.

tory Agency Procedures, who describe themselves as "SCRAP," [1] and a coalition of organizations dedicated to the protection of environmental resources. The applicants say that they intend to seek prompt review in this Court on the merits of the preliminary injunction entered below.

(1)

The Interstate Commerce Act, 49 U. S. C. § 1 *et seq.,* permits increases in railroad freight rates to become effective without prior approval of the Interstate Commerce Commission. A carrier may file a proposed tariff and, after 30 days unless the 'Commission shortens the period, the new rate becomes effective as a carrier-made rate. 49 U. S. C. § 6 (3). The Commission may, however, choose to suspend the effectiveness of newly filed rates for as much as seven months, in order to investigate the lawfulness of the rates. 49 U. S. C. § 15 (7). At the end of seven months, the carrier-proposed rates go into effect by operation of law unless the Commission has completed its investigation and affirmatively disapproved the new rates. *Ibid.* Prior decisions of this Court confirm the Commission's broad discretion in the exercise of its power of suspension; judicial review of suspension action or inaction is most severely limited, if not foreclosed. *Arrow Transportation Co.* v. *Southern R. Co.,* 372 U. S. 658 (1963); *Board of Railroad Comm'rs* v. *Great Northern R. Co.,* 281 U. S. 412, 429 (1930).

Against this legal background and prodded by an increasingly precarious financial condition, the railroads, on December 13, 1971, asked the Commission for leave to file on short 'notice a 2.5% surcharge on nearly

---

[1] SCRAP's complaint alleged that it is "an unincorporated association formed by five law students from the [George Washington University] National Law Center . . . in September 1971" whose "primary purpose is to enhance the quality of the human environment for its members, and for all citizens . . . ."

all freight rates. The railroads asked that the sur-
charge be effective as of January 1, 1972. The surcharge
was conceived as an interim emergency means of in-
creasing railroad revenues by some $246 million per
year, a sum the railroads describe as slightly less than
one-sixth of the increased expenses incurred annually
since the last general ratemaking proceedings. Selective
increases on a more permanent basis would follow.

By order dated December 21, 1971, the Commision
denied the railroads' request to make the 2.5%
surcharge effective as of January 1, 1972. The Com-
mission stated that it was aware of the carriers' need
for additional revenues, but concluded that publication
of the interim surcharge on short notice "would preclude
the public from effective participation" in proceedings
to evaluate the surcharge. 340 I. C. C. 358, 361. The
Commission did, however, rule that the railroads might
refile their proposed surcharge on January 5, 1972, to
be effective no earlier than February 5, 1972.

On January 5, 1972, the railroads filed tariffs to put
the 2.5% surcharge into effect on February 5. SCRAP
and other environmental groups asked the Commission
to suspend the surcharge for the statutory seven-month
period. They opposed the across-the-board surcharge
on the ground that the present railroad rate structure
discourages the movement of "recyclable" [2] goods in
commerce and that every across-the-board increase would

[2] At the time of filing these stay applications, there was disagree-
ment between the parties over the meaning of the term "recyclable,"
as it pertains to this lawsuit. The railroads apparently understood
the term "in the sense of processing of goods to obtain either a prod-
uct of the same kind or a previous state of the product." Supple-
mental Memo of Applicants, filed July 14, 1972, p. 2. SCRAP's list
of recyclable products, the railroads say, includes products that are
"not recyclable in any sense that the railroads understand that term,
but merely involve the familiar circumstances by which one usable
product is derived from another." *Id.*, at 3. See *infra*, at 1216.

further increase disincentives to recycling. The environmental groups contended that added disincentives to recycling would result in the increased degradation of the natural environment by discarded, unrecycled goods and in the increased exploitation of scarce natural resources. At a minimum, SCRAP objected to the Commission's failure to issue an "impact statement" evaluating the effect of the 2.5% surcharge on the shipment and use of recyclable materials. SCRAP contended that such a statement was required by the National Environmental Policy Act of 1969 (NEPA), 42 U. S. C. § 4321 *et seq.* Section 102 (2)(C) of NEPA, 83 Stat. 853, requires an impact statement "in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment. . . ." 42 U. S. C. § 4332 (2)(C).[3]

---

[3] Section 102 of NEPA provides, in pertinent part:

"The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall—

.        .        .        .        .

"(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

"(i) the environmental impact of the proposed action,

"(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

"(iii) alternatives to the proposed action,

"(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

"(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented."

"Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal

The railroads took the position that interim application of the across-the-board surcharge would not "significantly affect the quality of the human environment" within the meaning of NEPA. The railroads pointed out that the 2.5% surcharge would apply equally to all products; that past experience indicated little likelihood of reduced shipments of recyclable materials as a result of the across-the-board rate revision; that the increase was small relative to the normal increase approved in general freight rate revision cases; and that the increase would be short-lived.

By order dated February 1, 1972, the Commission announced that it would not suspend the 2.5% surcharge. It would, in effect, allow the surcharge to go into effect on February 5 and terminate on June 5, 1972. The order specifically stated the Commission's view that the surcharge would "have no significant adverse effect on the movement of traffic by railway or on the quality of the human environment within the meaning of the Environmental Policy Act of 1969." The Commission's order of February 1 further provided that the Commission would not resume the investigation begun by its December 21 order until the railroads asked to file the promised selective 4.1% rate increase. After that tariff was filed, on April 24, the Commission suspended the 4.1% selective increase for the statutory seven-month period until November 30, 1972. Since the original June 5 expiration date for the surcharge had assumed that selective increases would become effec-

agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes . . . ."

tive by that time, the Commission's order suspending the 4.1% selective increase eliminated the June 5 surcharge expiration date. The railroads then modified the temporary surcharge tariffs so that the 2.5% surcharge will expire on November 30, 1972, unless the 4.1% selective increase is approved prior to that time. The Commission's study of the proposed selective rate increase is still in progress and will include an environmental impact statement.

(2)

SCRAP filed suit on May 12, 1972, in the United States District Court for the District of Columbia, seeking, among other relief requested, a preliminary injunction to require the Commission to prevent the railroads from further collecting the 2.5% surcharge.[4] Other environmental groups and the railroads were allowed to intervene as a matter of right. The primary thrust of SCRAP's suit was that the Commission's orders, permitting and then extending the 2.5% surcharge, constituted "major Federal action significantly affecting the quality of the human environment." The plaintiffs argued that the Commission's action was unlawful because the Commission had not issued an environmental impact statement as required by NEPA. On July 10, 1972, the District Court issued a preliminary injunction enjoining the railroads from collecting the 2.5% surcharge on shipments originating after July 15, 1972, "insofar as that surcharge relates to goods being transported for purposes of recycling, pending further order of this court." In its opinion, the District Court rejected the Government's contention that SCRAP and its fellow plaintiffs lacked standing under this Court's decision in *Sierra Club* v. *Morton,* 405 U. S. 727 (1972).

---

[4] A three-judge court was convened to hear the case. See 28 U. S. C. §§ 2325, 2284.

The court's opinion noted that the SCRAP plaintiffs had alleged "that its members use the forests, streams, mountains, and other resources in the Washington [D. C.] area for camping, hiking, fishing and sightseeing, and that this use is disturbed by the adverse environmental impact caused by nonuse of recyclable goods." 346 F. Supp. 189, 195 (1972). This allegation, said the District Court, removed this case from the ambit of *Sierra Club,* "where the Sierra Club failed to allege 'that its members use Mineral King for any purpose, much less that they use it in any way that would be significantly affected by the proposed actions of the respondents.'" 405 U. S., at 735.

Having thus dealt with our decision in *Sierra Club,* the District Court focused on *Arrow Transportation, supra,* and related cases [5] drastically curtailing the jurisdiction of the federal courts to review the suspension power of the Interstate Commerce Commission. "The thrust of the doctrine," reasoned the District Court, "seems to be that judicial review is available only when the rates in question are Commission-made rather than carrier-made." 346 F. Supp., at 196. The District Court noted that the present case was not one "where the Commission merely stands silently by and allows carrier-made rates to take effect without suspension." *Ibid.* The Commission had found the surcharge rates just and reasonable, and it had authored a detailed set of conditions on approval of the rates without suspension. The District Court concluded that "[a] suspension decision which

---

[5] *E. g., Alabama Power Co.* v. *United States,* 316 F. Supp. 337 (DC 1969), and *Atlantic City Electric Co.* v. *United States,* 306 F. Supp. 338 (SDNY 1969), both aff'd by an equally divided court, 400 U. S. 73 (1970); *Electronics Industries Assn.* v. *United States,* 310 F. Supp. 1286 (DC 1970), aff'd, 401 U. S. 967 (1971); *Florida Citrus Comm'n* v. *United States,* 144 F. Supp. 517 (ND Fla. 1956), aff'd, 352 U. S. 1021 (1957); *Algoma Coal & Coke Co.* v. *United States,* 11 F. Supp. 487 (ED Va. 1935).

effectively blackmails the carriers into submitting agency-authored rates is functionally indistinguishable from an agency order setting those rates . . . . [S]uch orders are, of course, judicially reviewable." *Id.*, at 197.

Yet the District Court found it unnecessary to decide the degree of Commission involvement in effectuating the 2.5% surcharge. The court held that "NEPA implicitly confers authority on the federal courts to enjoin *any* federal action taken in violation of NEPA's procedural requirements, even if jurisdiction to review this action is otherwise lacking." *Ibid.* The federal courts would have jurisdiction to review, and to enjoin, "even a mere failure to suspend rates which are wholly carrier-made so long as the review is confined to a determination as to whether the procedural requisites of NEPA have been followed." *Id.*, at 197 n. 11. Recognition of this jurisdiction would not undermine the *Arrow* decision, because "judicial insistence on compliance with the non-discretionary procedural requirements of NEPA in no way interferes with the Commission's substantive discretion," *id.*, at 198, to suspend rates pending investigation and final action.

Turning to the merits, the court held that the Commission's decision not to suspend was a "major federal action" within the meaning of NEPA. An impact statement would be required whenever an action *"arguably* will have an adverse environmental impact." *Id.*, at 201. (Emphasis in original.) The Commission could not escape preparation of a statement by "so transparent a ruse" as its "single sentence" affirmation that the 2.5% surcharge would have no significant adverse environmental effect. This finding is "no more than glorified boiler-plate," *id.*, at 201 n. 17, and the Commission has failed to prove its truth.

Finally, the District Court concluded that the balance of equities in this case tipped in favor of preliminary

relief. Any damage to the environment would likely be irreparable. But "the damage done the railroads by granting the injunction, while clearly nonfrivolous, is not overwhelming." *Id.*, at 201–202. Without opinion, the District Court declined to stay its preliminary injunction pending appeal.

### (3)

It is likely that the questions to be presented by this appeal "are of such significance and difficulty that there is a substantial prospect that they will command four votes for review" when the full Court reconvenes for the October 1972 Term. *Organized Village of Kake* v. *Egan,* 80 S. Ct. 33, 35, 4 L. Ed. 2d 34, 37 (1959) (BRENNAN, J., in chambers). The decision below may present a serious question of standing to sue for the protection of environmental interests. *Sierra Club.* v. *Morton, supra.* The decision may be read as undermining our *Arrow* decision and in that respect may conflict with the reasoning of the Second Circuit in *Port of New York Authority* v. *United States,* 451 F. 2d 783 (CA2 1971). Most important, the decision may have the practical effect of requiring the Commission to file an impact statement whenever it exercises its statutory suspension powers. This requirement is significant because it would likely apply to each of the cluster of federal agencies presently exercising suspension powers comparable to that of the Interstate Commerce Commission.[6]

---

[6] Among suspension provisions enacted by Congress since 49 U. S. C. § 15 (7) are 49 U. S. C. §§ 316 (g), 318 (c) (Motor Carrier Act, 1935); 49 U. S. C. §§ 907 (g), (i) (Water Carriers Act); 49 U. S. C. § 1006 (e) (Freight Forwarders Act); 47 U. S. C. § 204 (Federal Communications Act of 1934); 16 U. S. C. § 824d (e) (Federal Power Act); 15 U. S. C. § 717c (e) (Natural Gas Act); and 49 U. S. C. § 1482 (g) (Federal Aviation Act of 1958). See *Arrow Transportation Co.* v. *Southern R. Co.,* 372 U. S. 658, 666 n. 13 (1963).

For these reasons, I would not be prepared to conclude that the Court would dispose summarily of the dispute underlying these stay applications. I must, therefore, consider whether allowing or staying the preliminary injunction is most likely to insure fair treatment for the interests of the parties and the public until the full Court acts. On the allegations of the parties some injury will occur whichever course is taken. Those opposing the stay naturally point to the large weight to be given to the District Court's evaluation or "balancing" of the equities.

The harm to the railroads, and to the overall public interest in maintaining an efficient transportation network, is immediate and direct. Badly needed revenues will be lost at once, and there is little likelihood that they can be recouped. The railroads originally estimated the loss at $500,000 per month, but they have revised that estimate upwards by several times since advised by SCRAP that it attaches an unexpectedly broad interpretation to the District Court's injunction. Unlike the District Court, I find it difficult to dismiss this certain loss of at least one and perhaps several millions of dollars simply because it is "not overwhelming" relative to the total revenues to be derived from the surcharge. Nor is it sufficient to discount the lost revenues because they might have to be disgorged if found unreasonable by the Commission at a later date. The chances of such a ruling are, again, only speculative. As a general premise for evaluation, the possibility of rebate suggests equally that shippers would not regard the surcharge as a significant additional cost.

On the other hand, the District Court was convinced that harm to the environment might result from allowing the railroads to collect the 2.5% surcharge on recyclable goods pending disposition of their appeal in this Court. The District Court concluded that any such harm would likely be irreparable, since, as the court explained, "once

raw materials are unnecessarily extracted from the ground and used, they cannot be returned from whence they came." [7]  346 F. Supp., at 201.  This eventuality is premised on the following projected chain of events:

> (a) The railroads will collect the 2.5 percent surcharge on recyclable, as well as all other materials.
>
> (b) Because recyclable materials are already discriminated against in freight rates, the surcharge further increases rate disparities and, in any event, raises the absolute cost of transporting recyclable materials, often a high proportion of their total cost.
>
> (c) This increase in cost will result in decreased demand for recyclable materials.
>
> (d) This decrease in demand will be counterbalanced by an increased demand for new or unrecycled materials.
>
> (e) This increased demand for new materials will result in extraction of natural resources not otherwise planned.

There is evidence in the record arguably supporting this forecast of the consequences of increasing freight rates on recyclable goods in common with others.

Our society and its governmental instrumentalities, having been less than alert to the needs of our environment for generations, have now taken protective steps. These developments, however praiseworthy, should not lead courts to exercise equitable powers loosely or casually whenever a claim of "environmental damage" is asserted.

---

[7] In evaluating the possibility of irreparable harm to the environment, the District Court did not mention the danger of increased disposal of recyclable materials.  The District Court had adverted to this problem earlier in its opinion.  Since the lower court did not premise its action on this possibility, it apparently concluded that any short-range harm to the environment caused by increased disposal would not be irreparable.

The world must go on and new environmental legislation must be carefully meshed with more traditional patterns of federal regulation. The decisional process for judges is one of balancing and it is often a most difficult task.

A District Court of three judges has considered this application for a stay pending appeal and has concluded that the stay should be denied. The criteria for granting a stay of the judgment of such a district court are stringent, at least when the necessity for a stay turns upon a refined factual evaluation of its effect. "An order of a court of three judges denying an interlocutory injunction will not be disturbed on appeal unless plainly the result of an improvident exercise of judicial discretion." *United Fuel Gas Co.* v. *Public Service Comm'n,* 278 U. S. 322, 326 (1929); *Railway Express Agency* v. *United States,* 82 S. Ct. 466, 7 L. Ed. 2d 432 (1962) (Harlan, J., in chambers). I cannot say the District Court's action can be equated with an abuse of discretion because it decided that there was danger to the environment outweighing the loss of income and consequent financial threat to the railroads. Notwithstanding my doubts of the correctness of the action of the three-judge District Court, as Circuit Justice, acting alone, I incline toward deferring to their collective evaluation and balancing of the equities.

Reluctantly, I conclude that the applications for stay pending appeal should be denied.