OCTOBER 11, 1974

No. A–232. MINNESOTA ET AL. *v.* RESERVE MINING CO. ET AL.; and

No. A–262. UNITED STATES *v.* RESERVE MINING CO. ET AL. Respective applications for an order vacating or modifying stay order of the United States Court of Appeals for the Eighth Circuit, presented to MR. JUSTICE BLACKMUN, and by him referred to the Court, are both denied. Four Justices, however, state explicitly that these denials are without prejudice to applicants' renewal of their applications to vacate if the litigation has not been finally decided by the Court of Appeals by January 31, 1975. Reported below: 498 F. 2d 1073.

MR. JUSTICE DOUGLAS, dissenting.

I would vacate the stay issued by the Court of Appeals.

District Judge Lord made detailed findings, 380 F. Supp. 11, 16 (Minn. 1974), as to the health hazard of respondent Reserve Mining Co.'s discharges into the air and into the waters of Lake Superior, findings which I attach as an Appendix to this opinion. The Court of Appeals disagreed with Judge Lord's conclusion

but it stopped short of holding that his findings were "clearly erroneous" within the meaning of Fed. Rule Civ. Proc. 52 (a). Even in its view, the issue, however, was close or rather neatly balanced.[1] It therefore decided that being "a court of law" it was "governed by rules of proof" and that "unknowns may not be substituted for proof of a demonstrable hazard to the public health." [2]

That position, however, with all respect, makes "maximizing profits" the measure of the public good, not health of human beings or life itself. Property is, of course, protected under the Due Process Clause of the Fifth Amendment against federal intrusion. But so are life and liberty. Where the scales are so evenly divided, we cannot say that the findings on health were "clearly erroneous" nor am I able to discover how "maximizing profits" becomes a governing principle overriding the health hazards. If equal justice is the federal standard, we should be as alert to protect people and their rights

---

[1] The Solicitor General, at 2–3 of the brief he filed with us in No. A–262, states:

"In all of this the court of appeals has proceeded on an admittedly preliminary assessment, based on limited exposure to the voluminous record, of the question whether the continued daily discharge of some 67,000 tons of suspended solid waste into Lake Superior and some 100 tons of particulate matter into the air constitutes a significant threat to public health. While we believe that the court of appeals' conclusion in this regard rests upon crucial assumptions that are refuted by the substantial evidence of record here, we do not think it appropriate to attempt to argue such evidentiary issues to this Court on an even more limited record. Suffice it to say that there is no serious dispute that the amphibole discharges in question are widely believed to entail a risk of asbestosis, cancer, and other adverse health consequences, and the only real dispute concerns the quantitative assessment of the likelihood of such consequences—an assessment that is particularly difficult here because of the apparently long-term and cumulative results of exposure to such materials."

[2] 498 F. 2d 1073, 1084.

as the Court of Appeals was to protect "maximizing profits." If, as the Court of Appeals indicates, there is doubt, it should be resolved in favor of humanity, lest in the end our judicial system be part and parcel of a regime that makes people, the sovereign power in this Nation, the victims of the great god Progress which is behind the stay permitting this vast pollution of Lake Superior and its environs. I am not aware of a constitutional principle that allows either private or public enterprises to despoil any part of the domain that belongs to all of the people. Our guiding principle should be Mr. Justice Holmes' dictum that our waterways, great and small, are treasures,[3] not garbage dumps or cesspools.

## APPENDIX TO OPINION OF DOUGLAS, J., DISSENTING

(3) The particles when deposited into the water are dispersed throughout Lake Superior and into Wisconsin and Michigan.

(4) The currents in the lake, which are largely influenced by the discharge, carry many of the fibers in a southwesterly direction toward Duluth and are found in substantial quantities in the Duluth drinking water.

(5) Many of these fibers are morphologically and chemically identical to amosite asbestos and an even larger number are similar to amosite asbestos.

(6) Exposure to these fibers can produce asbestosis, mesothelioma, and cancer of the lung, gastrointestinal tract and larynx.

(7) Most of the studies dealing with this problem are concerned with the inhalation of fibers; however, the available evidence indicates that the fibers pose a risk when ingested as well as when inhaled.

---

[3] *New Jersey* v. *New York*, 283 U. S. 336, 342 (1931).

(8) The fibers emitted by the defendant into Lake Superior have the potential for causing great harm to the health of those exposed to them.

(9) The discharge into the air substantially endangers the health of the people of Silver Bay and surrounding communities as far away as the eastern shore in Wisconsin.

(10) The discharge into the water substantially endangers the health of the people who procure their drinking water from the western arm of Lake Superior including the communities of Beaver Bay, Two Harbors, Cloquet, Duluth, and Superior, Wisconsin.

(11) The present and future industrial standard for a safe level of asbestos fibers in the air is based on the experience related to asbestosis and not to cancer. In addition its formulation was influenced more by technological limitations than health considerations.

(12) The exposure of a non-worker populace cannot be equated with industrial exposure if for no other reason than the environmental exposure, as contrasted to a working exposure, is for every hour of every day.

(13) While there is a dose-response relationship associated with the adverse effects of asbestos exposure and may be therefore a threshold exposure value below which no increase in cancer would be found, this exposure threshold is not now known.