CITY OF SOUTH PASADENA, a Munici-
pal Corporation, et al., Plaintiffs,

v.

John A. VOLPE, Individually and as
Secretary of Transportation, et
al., Defendants,

City of Pasadena, a Municipal
Corporation, Intervenor.

No. CV–73–81–EC.

United States District Court,
C. D. California.

Jan. 15, 1976.

Charles R. Martin, City Atty., City of South Pasadena, Martin & Flandrick, Inc., Sp. Counsel, San Marino, Cal., Center for Law in the Public Interest, Fredric P. Sutherland, Brent N. Rushforth, Carlyle W. Hall, Jr., John R. Phillips, Los Angeles, Cal., for plaintiffs.

Harry S. Fenton, Chief Counsel, Joseph A. Montoya, Benjamin B. Salvaty, Robert V. Cohune, Ellen D. Tiger, Los Angeles, Cal., for State defendants.

William D. Keller, U. S. Atty., Matthew A. Schumacher, Asst. U. S. Atty., Los Angeles, Cal., for Federal defendants.

Wendell R. Thompson, City Atty., City of Pasadena, James O. Kahan, Deputy City Atty., Pasadena, Cal., Burke Williams & Sorensen, Royal M. Sorensen, Los Angeles, Cal., for intervenor, City of Pasadena.

Gustling, Gail & McCabe, Donald R. Gail, Los Angeles, Cal., for amicus curiae Concerned Southwest Residents of Pasadena.

## FINDINGS OF FACT

CRARY, District Judge.

State Defendants' Motion for Order Amending the Stipulation and Order Concerning Actions to be Taken with Respect to the Proposed Long Beach Freeway Project and the Motion to Modify the Order of Intervenor City of Pasadena came on regularly for hearing on December 8, 17, 18 and 19, 1975 and January 6, 1976 in the courtroom of the Honorable E. Avery Crary, United States District Judge.

Evidence having been presented by way of oral testimony, affidavits, documents, photographs and other exhibits; memoranda of points and authorities having been submitted by counsel in support of their respective positions; the matter having been argued by the parties and amicus curiae through their respective counsel, and the Court having taken the motions under submission, the Court does now hereby make the following:

## FINDINGS OF FACT

1. Plaintiff City of South Pasadena (hereinafter "South Pasadena") is a municipal corporation organized and existing under the laws and constitution of the State of California. It is located generally south of Pasadena. A portion of the northerly boundary of South Pasadena is Columbia Street which runs in an east-west direction. Said Columbia Street is also a portion of the southerly boundary of the City of Pasadena.

2. Amicus Curiae Concerned South West Residents of Pasadena (hereinafter "South West Residents") is an unincorporated association whose members are homeowners and other residents of the southwestern portion of Pasadena. South West Residents, by and through its counsel, has been present at all hearings concerning the modification of the Stipulation and Order, has had the right to introduce evidence, cross-examine witnesses and present both written and oral argument.

3. Intervenor City of Pasadena (hereinafter "Pasadena") is a municipal corporation organized and existing under the laws and Constitution of the State of California. Pasadena was not originally a party herein nor was it a party to the Stipulation and Order Concerning Actions to be Taken with Respect to the Proposed Long Beach Freeway Project.

4. Defendant California Department of Transportation, successor in interest to California Department of Public Works, is an

agency of the State of California, authorized and directed to provide for the construction of all State highways, including those which are a part of the system of Federal-Aid-Highways, on locations designated by California Highway Commission. Defendant James A. Moe, predecessor of Sidney C. McCausland, was the Director of the California Department of Transportation and was charged with the overall control and supervision of the activities of said department. Defendant Robert Datel was the State Highway Engineer and Chief of the Division of Highways, a subagency within the Department of Transportation, and said defendant was charged with the overall control and supervision of the activities of said division. Said defendants are hereinafter referred to collectively as the "State Defendants."

5. Defendants John A. Volpe, formerly Secretary of the United States Department of Transportation, F. E. Hawley, formerly Administrator for the Federal Highway Administration, and Donald E. Trull, formerly Division Engineer for the Federal Highway Administration, are hereinafter referred to collectively as "Federal Defendants." Federal defendants did not appear at the proceedings herein but by way of Statement of Federal Defendants in Support of State Defendants' Motion for Order Amending Stipulation and Order, filed herein, said federal defendants have stated their support for State defendants' motion.

6. The Los Angeles metropolitan area is composed of both a "center city" commonly referred to as the Central Business District and various peripheral municipalities or centers of activity which are located throughout the region. The peripheral centers are major employment/commercial/residential developments, and, in many aspects, provide services and facilities which are independent of the Los Angeles Central Business District. The City of Pasadena, which has a population in excess of 110,000, is one of the major peripheral centers of the Los Angeles metropolitan area.

7. The majority of movements of people and goods between the various parts of the metropolitan area are made in private autos or commercial vehicles which travel over the vast network of streets, highways and freeways which have been constructed in the area over the many years of its development.

8. A system of freeways has been built which connects the Los Angeles central business district with the outlying residential areas and the various peripheral communities and those areas and communities to each other.

9. The extensive network of freeways in the Los Angeles area is composed, for the most part, of multilane facilities which have controlled access, physical dividers which separate opposing flows of traffic and with points of ingress and egress located sufficiently far apart so that motorists may maneuver safely. Due to their superior design features, and the faster and safer trips which they permit, most motorists prefer to use them rather than the surface street systems.

10. This freeway system contains a completed inner loop of approximately 10 ½ miles. The inner loop includes portions of Pasadena (Route 11), Harbor, Santa Monica and Golden State Freeways and generally surrounds the Los Angeles Central Business District. The outer loop of approximately 76 miles includes portions of the Ventura, San Diego and Long Beach (Route 7) Freeways. All of the outer loop has been completed but for a gap of approximately 6 miles. That gap is within the Route 7 corridor between the interchange of the Foothill, Ventura and Long Beach Freeway, which is located immediately north of the San Bernardino Freeway. The aforementioned interchange will be referred to as the "134/210/7 Interchange". Pasadena has a direct relationship to the incomplete section of the Long Beach Freeway because it is a vital part of the outer loop around Los Angeles.

11. The western portion of the Foothill Freeway, the Ventura Freeway and the Pasadena Freeway all presently terminate in the western portion of the City of Pasadena. These freeways have had a major

influence on the movement of vehicles in Pasadena. Pasadena also has been affected by the section of the Foothill Freeway which has been constructed to and terminated at the eastern boundary of Pasadena at Rosemead Boulevard.

12. The uncompleted portion of the Foothill Freeway, which will bisect the City of Pasadena in an east-west direction is now under construction and is expected to be opened to traffic in February of 1976. California Streets and Highways Code provides that the Long Beach Freeway, which now has a northern terminus at Valley Boulevard, a short distance north of the San Bernardino Freeway, will be extended northward to a connection with the Ventura and Foothill Freeways at their existing junction in the western part of Pasadena.

12A. Interstate 210 is a major freeway running in an east-west direction across Pasadena. Presently, it ends at Rosemead Boulevard on the east side of Pasadena and the 134/210/7 Interchange on the west side of Pasadena. The balance of Interstate 210 in Pasadena is scheduled to be opened for traffic in late February 1976. The opening of Interstate 210 will provide substantial relief from congestion on local east-west streets in Pasadena, many of whose carrying capacity is presently exceeded. Moreover, Interstate 210 will improve the safety factor on the local east-west streets in Pasadena, particularly those parallel streets in the vicinity of Interstate 210.

13. The uncompleted Route 210 Freeway between Rosemead Boulevard and Orange Grove Boulevard is approximately five miles in distance and that work is being done in two phases. Construction for the first phase under Contract 07–155014 included the 134, 210 and 7 Interchange and the related freeway construction located with Route 210 at Orange Grove Blvd. on the north, Route 210 at Fair Oaks Ave. on the east, Route 7 at Colorado Blvd. on the south and Route 134 at Orange Grove Blvd. on the west. Construction under that contract began on January 26, 1972 and was completed on February 24, 1975.

14. Work on the second phase under construction, contract 07–155024 includes the Route 210 Freeway between Fair Oaks Ave. on the west and Rosemead Blvd. on the east (approximately 4.2 miles) and work in the Route 7 corridor between Colorado Blvd. on the north and Columbia St. on the south over a distance of approximately 1.5 miles. The construction work in the Route 7 corridor includes:

a) Freeway roadways between Colorado Blvd. on the north and Del Mar Blvd. on the south for a distance of approximately 0.5 mile.

b) Ramps to Del Mar Blvd. and California Blvd.

c) Conversion of St. John Ave. (southbound) and Pasadena Ave. (northbound) to one-way streets for approximately 0.3 mile immediately south of California Blvd.

d) Coupling of St. John Ave. with Pasadena Ave. south of Bellefontaine St. by construction of the so-called "wishbone".

e) A fourteen (14) foot widening on the east side of approximately ½ mile stretch of Pasadena Ave. between the wishbone on the north and Columbia Street on the south, which will permit four (4) lanes.

f) Resurfacing of the widened part of Pasadena Avenue.

Construction of work under the contract for the second phase began October 6, 1972 and the work under this contract exceeds $35,000,000. The total amount for the work under the two contracts is approximately $57,500,000. No federal funds have been used for the above-described construction work south of the north side of Green Street nor are federal funds planned to be used for such work that is now under contract.

15. This action was commenced on January 15, 1973. The complaint charged various federal and state highway agencies and officials with violations of federal and state laws in connection with the proposed construction of the uncompleted northerly portion of California State Highway Route 7,

known locally and hereinafter referred to as the Long Beach Freeway. If completed, the Long Beach Freeway is proposed to run approximately 28 miles in a generally north-south direction from the City of Long Beach in the south to the City of Pasadena in the north. At the present time, however, only the southerly portion of the Long Beach Freeway has been completed and it now terminates at Valley Boulevard in the City of Los Angeles, approximately one mile north of the interchange with the San Bernardino Freeway (Interstate 10). This action concerns the uncompleted northerly portion from Valley Boulevard through the City of South Pasadena to the "134/210/7 Interchange" in the City of Pasadena, a distance of approximately six miles.

16. On or about March 2, 1973, state defendants and plaintiffs entered into an agreement entitled "Stipulation and Order Concerning Actions to be Taken with Respect to the Proposed Long Beach Freeway Project" (hereinafter referred to as the "Stipulation and Order"). The Stipulation and Order was signed by the Honorable E. Avery Crary on March 7, 1973, and is presently in effect. In summary, the Stipulation and Order provides that state defendants shall prepare an environmental impact statement and an environmental impact report complying with the provisions of the National Environmental Policy Act (NEPA) and California Environmental Quality Act (CEQA) respectively, and shall hold public hearings complying with Section 128 of the Federal-Aid Highway Act (FAHA). During the period of time necessary to comply with these laws, state defendants are prohibited from undertaking certain construction, right-of-way acquisition and other activities with respect to the proposed Long Beach Freeway.

16A. State defendants are permitted only to construct a short stretch of the Long Beach Freeway, south to Del Mar Blvd. in the City of Pasadena, a distance of approximately one third of a mile. State defendants are prohibited from beginning construction of the on-ramp to and the off-ramp from the Freeway between Del Mar Boulevard and California Bouelvard until they submit the final environmental impact statement required by NEPA to the United States Department of Transportation. The Stipulation and Order also prohibits any construction south of California Boulevard until the environmental impact report has received final approval from the United States Department of Transportation. The Stipulation and Order also provides that no traffic shall be permitted on the Long Beach Freeway in the City of Pasadena until such time as the state defendants submit the final environmental impact statement to the United States Department of Transportation.

16B. On November 21, 1975, the state defendants filed a motion to modify the Stipulation and Order. Also on November 21, 1975, the City of Pasadena filed a motion to intervene and a motion to modify the Stipulation and Order. By these motions, the state defendants sought to modify the provisions of the Stipulation and Order and Pasadena sought to modify the Order so that the state defendants may proceed with construction of the facilities hereinafter described in Finding No. 28.

17. The Stipulation and Order contemplated that the Draft Environmental Impact Statement (DEIS) would be completed in early 1974 and that a hearing (or hearings) would be held after the circulation of the DEIS. The State defendants' time schedule contemplated a public hearing or hearings in the Spring of 1974, submission of the Final Environmental Impact Statement (FEIS) to the United States Department of Transportation in the fall of 1974 and final approval by the United States Department of Transportation in mid-1975. This time schedule would have enabled the State defendants to have completed the construction of the work in the Route 7 Corridor prior to opening of the Foothill Freeway.

18. The schedule anticipated for processing the Route 7 EIS was based on State and Federal regulations in force at the time the Stipulation and Order was entered into and filed in March of 1973. These were the

initial implementation regulations of NEPA and CEQA. Subsequently, these regulations were amended and expanded, thereby requiring a more comprehensive and time consuming study and analysis for the EIS. On the basis of the amended regulations, State defendants determined that the various alignments in the Meridian Corridor, the Westerly Corridor that is supported by Plaintiff City of South Pasadena, and the Partial Completion variation, the analysis of which was required by the Stipulation and Order, would all require more study.

19. During the refinement of these studies, State Defendants also decided to more fully analyze a previously discarded Westerly Corridor variation commingled with the Pasadena Freeway. This decision was based upon South Pasadena's contention that the latter variation would have greatly reduced the environmental impacts. In the meantime, both the Southern California Rapid Transit District (RTD) and the Southern California Association of Governments (SCAG) developed transit master plans which included a busway on exclusive right of way in the Long Beach Freeway Corridor. Therefore, it was necessary to again expand the studies for the EIS to include alternatives incorporating busway facilities.

20. These factors resulted in numerous setbacks in the process of development of the DEIS. The preliminary DEIS was finally completed in the late summer of 1974, and thereafter processed informally with state and federal authorities for consistency with their general requirements. State and federal defendants completed review and editing of the preliminary draft concurrently with the aforesaid processing. Approval to circulate the DEIS was given on December 23, 1974. Printing, collating, binding and addressing followed and the circulation period for the DEIS commenced on March 17, 1975.

21. The circulation period, during which any member of the public or any agency on any level could comment on the DEIS, ended on May 27, 1975. However, appropriate extensions of time to comment were grant-ed to all who requested them. Among others, comments were received from Plaintiff City of South Pasadena as well as the co-chairpersons of the Plaintiff Pasadena Freeway Study Committee. During the circulation period state and federal defendants held six community workshops in the cities of Alhambra, Los Angeles, Pasadena and South Pasadena for purposes of informing the public and soliciting their comments on the proposed Long Beach Freeway Project. These workshops included presentations by various officials of state and federal defendants as well as distribution of a digest of the DEIS. Comments, both written and oral, were solicited and received from the public at these workshops.

22. The cost of the DEIS was $3,800,000 and the preparation of the DEIS entailed 110 man years. The DEIS includes a discussion of the proposed Route 7 and various alternatives thereto and an assessment of the environmental impacts of these alternatives insofar as air quality, noise and traffic is concerned. These alternatives include the construction work and use sought in the motion for modification, the partial completion to California Boulevard, the no-open alternative for Route 7, the no-project alternative, and a westerly corridor variation, among others. South Pasadena requested and was granted an extension of time to comment on the DEIS. South Pasadena submitted its comments to the DEIS but these comments made no reference to the wishbone alternative.

23. On October 2, 1974, the City Council of South Pasadena endorsed by resolution a new westerly Corridor Variation which was referred to as "Westerly Route—Reynolds Realignment Plan 'B' ". However, Plaintiff South Pasadena did not furnish State defendants with a map of that variation for purposes of copying and reproducing until January 8, 1975. That resolution requested State defendants to consider the environmental impacts of that variation along with other alternatives and that this consideration be given in the DEIS. However, due to the fact that to have included Plan B in the DEIS would have resulted in a further

delay of eight to twelve months in the circulation of the DEIS and the fact that Plan B was simply a variation of the Westerly Route included in the DEIS, the DEIS was circulated without Plan B being included therein. State defendants, nevertheless, decided to prepare a supplement to the DEIS containing an analysis of Plan B, among other things.

24. As a result of the enactment of the 1975 Arroyo Seco Parklands Preservation Law (Sections 8650 et seq. of the California Public Resources Code, effective January 1, 1976), which prohibits use of the Arroyo Seco Parklands for new State highways, studies on Plan B have been terminated because the latter would have required the use of prohibited park lands. Plan B is no longer a reasonable alternative because it would require the use of Arroyo Seco Parklands for a new state highway.

25. On August 15, 1975, the City Council of South Pasadena passed Resolution 5221 which endorsed still another variation of the westerly corridor which would bypass the Arroyo Seco Park. This variation was called "Plan C". This request and variation caused further delay in complying with NEPA and scheduling of the FAHA hearings.

26. In its comments on the DEIS, South Pasadena did not submit any comment or objection to the construction and use of the facilities described in Finding No. 14.

27. Because of the request of Plaintiff City of South Pasadena for inclusion of Route C in the Route 7 EIS, the State defendants elected to prepare a supplement including Plan C. The completion of the supplement to the DEIS is scheduled for May 1976 after completion of alternate designs and analysis. The supplement to the DEIS is scheduled to be circulated in the summer of 1976. The public hearing required by § 128 of the FHA has not been held, but is scheduled to be held in the fall of 1976. Submission of the FEIS to the United States Department of Transportation is scheduled for late 1976 with approval anticipated by the fall of 1977. If Plan C had not been considered, a public hearing could already have been held and the approval of the FEIS would have been at a much earlier date. The request of South Pasadena has had the effect of additional delay in the submission of the FEIS.

28. The motions of State defendants and Intervenor City of Pasadena request modification of the Stipulation and Order so as to permit:

a. Construction of the on-ramp and off-ramp between Del Mar Blvd. and California Blvd.

b. Conversion of St. John Ave. (southbound) and Pasadena Ave. (northbound) to one-way streets for approximately 0.3 miles immediately south of California Blvd.

c. The coupling of St. John Ave. with Pasadena Ave. south of Bellefontaine St. by construction of the so-called "wishbone".

d. A 14-foot widening of the east side of the approximately ½ mile stretch of Pasadena Ave. between the wishbone on the north and Columbia St. on the south.

e. Resurfacing of the widened part of Pasadena Ave.

f. Opening of the Route 7 facilities south of the 134/210/7 Interchange.

This construction hereinafter will be referred to as the "wishbone".

29. The southern terminus of the proposed wishbone is Columbia Street which is the boundary between Pasadena and South Pasadena. Columbia Street extends from Orange Grove Boulevard on the west to Fair Oaks Avenue on the east. Fremont Avenue extends southerly from Columbia Street and lies just easterly of the midpoint between Orange Grove Boulevard and Fair Oaks Avenue. Fremont Avenue is the only arterial thoroughfare extending southerly from Columbia Street all the way through the Route 7 corridor to a point near the completed portion of Route 7 at Valley Boulevard on the south. The intersection of Fremont Avenue and Columbia Street is currently signed for traveling thereon in either an easterly or westerly direction as follows: South Pasadena lies to the south,

the City of Alhambra lies 3 miles to the south, and the City of Los Angeles lies 8 miles to the south. Fair Oaks Avenue is a north-south arterial street whose northerly terminus is north of Interstate 210 in the City of Pasadena and whose southerly terminus is Huntington Drive in South Pasadena. Fair Oaks Avenue is presently a truck route and will remain as such when Interstate 210 opens whether or not the wishbone is built and implemented. Orange Grove is a north-south arterial street extending from a point northerly of Interstate 210 in Pasadena to Mission Street, a few hundred feet south of the Pasadena Freeway (Route 11) in South Pasadena. Arroyo Parkway is a major north-south arterial street in Pasadena extending from Holly Street on the north to the beginning of the Pasadena Freeway at Glenarm Street in Pasadena on the south.

30. The opening of Interstate 210 Freeway will result in an increase of 35,000 to 40,000 vehicles per day in the north-south corridor between Figueroa Street on the west and Lake Avenue on the east and Interstate 210 on the north and Route 7 at Valley Boulevard on the south. Of this 35,000 to 40,000 vehicles per day, 20,000 to 25,000 vehicles will utilize the Pasadena Freeway which traverses the northerly portion of South Pasadena in a generally east-west direction. Access to and from Pasadena Freeway in South Pasadena is via on-ramps and off-ramps at Orange Grove Boulevard and Fair Oaks Avenue in South Pasadena. There are no on-ramps nor off-ramps for Route 11 at Fremont Avenue.

31. The wishbone will reduce the dispersal of traffic through the local streets of Pasadena and South Pasadena by channeling traffic and delivering it to major arterials. Major arterials are better equipped to handle large volumes of traffic. Further this reduction in traffic dispersal on local streets will improve safety insofar as the residents on the local streets are concerned. Further the wishbone will provide better accessibility for South Pasadena to Interstate 210 on the north. Further the wishbone will provide a better opportunity to manage and control the traffic to deliver it to those streets which are most capable of handling it. Further the wishbone will create more capacity in the corridor to handle the increased traffic when Interstate 210 opens. When Interstate 210 opens, if the wishbone is not constructed and implemented, the traffic from Interstate 210 desiring to use the corridor as hereinabove described will disperse through the local streets in Pasadena and South Pasadena.

32. Construction work which has been completed on Route 7 but which cannot be opened to traffic under the Stipulation and Order includes the Route 7 Freeway from the 134/210/7 Interchange to Del Mar Boulevard in Pasadena, the Route 134-Route 7 connector roads and the Route 210-Route 7 connector roads. The cost of this completed but unused portion of construction is $13,-300,000.

33. The wishbone was designed as an interim end-of-freeway facility at the request of Pasadena. On or about July 25, 1969, South Pasadena was informed of state defendants' intent to construct the wishbone and South Pasadena was further informed that the construction and implementation of the wishbone would not make the handling of traffic any more acute in South Pasadena. South Pasadena did not object to the wishbone. On or about March 4, 1971, South Pasadena was again informed of state defendants' intent to construct the wishbone and further was informed that the construction and implementation of the wishbone would not make the traffic situation in South Pasadena any more acute than if the wishbone were not constructed. Again South Pasadena did not object to the wishbone.

34. No additional right-of-way is required for the construction and implementation of the wishbone. Further, no residential, commercial, industrial or other structures will be removed or demolished if the wishbone is constructed. There will be no displacement of any residents as a result of the construction of the wishbone but approximately 60 trees and the parkway on Pasadena will be removed.

35. Route 210 will be completed in Pasadena and is scheduled to be open for use between the easterly city limits of said city and the "134/210/7 Interchange" in February 1976. At such time as Route 210 is opened, the amount of traffic seeking to move along said freeway in a westerly direction and in a southerly direction along the general route of the proposed Route 7 Freeway within the City of Pasadena to the southerly border of the City of Pasadena at Columbia Street will be increased by a large volume; such vehicular traffic will be seeking access to the Pasadena Freeway at Glenarm Street in Pasadena and the on-ramps at Fair Oaks Avenue and Orange Grove Avenue in the northerly portion of South Pasadena and that further said southerly moving traffic will be seeking the present termination of the northerly construction of the Route 7 Freeway just north of the San Bernardino Freeway.

36. Under the present street configuration in the City of Pasadena the north-south streets that will receive the burden of said traffic after the opening of said Route 210 Freeway are Orange Grove Avenue, Fair Oaks Avenue and Arroyo Parkway; that said streets are so designed and constructed that they will not be able to handle the increased volume of traffic thus causing an influx of traffic upon the local streets within that area lying primarily south of California Boulevard, north of the Pasadena Freeway, west of Lake Avenue and east of Arroyo Boulevard, all as particularly designated on Exhibit 9.

37. Said southerly moving traffic will seek the arterials in South Pasadena designated as Fair Oaks Avenue, Fremont Avenue and Orange Grove Avenue between Columbia Street and the Pasadena Freeway. Fremont Avenue presently is signed and used as means of access from Columbia Street southerly through South Pasadena to Alhambra and the City of Los Angeles.

38. The area which the southwesterly moving traffic within the City of Pasadena will impact most heavily is that area referred to as the Route 7 Corridor within the City of Pasadena lying generally between Lake Avenue on the east, Arroyo Boulevard on the west and with its northerly terminus being the existing "134/210/7 Interchange" and Columbia Street being the southerly boundary thereof.

39. The vehicular traffic which will exit from the 210 Freeway upon its completion and which will seek the southerly movement in the Route 7 Corridor will occur generally during the morning commuter hours of 7:30–8:30 A.M. and will cause a severe traffic impact and congestion and resulting safety hazards by reason of the conflict between commuter movements and normal residential vehicular movements in that area described in Finding No. 36, both within the City of Pasadena and the City of South Pasadena.

40. The construction of the wishbone facilities and the use of the existing Route 7 stub within the City of Pasadena will relieve the traffic congestion and impact within the City of Pasadena on all streets except St. John Avenue and Pasadena Avenue which will be designed and improved as one-way arterial streets to facilitate the movement of the traffic thereon.

41. At such time as the Route 210 Freeway opens, the traffic resulting therefrom in southwesterly Pasadena will be increased, and it also will be increased in South Pasadena, particularly between Columbia Street and the Pasadena Freeway in the northerly portion of the City of South Pasadena.

42. The wishbone construction will permit the increased volume of traffic passing through the southwesterly portion of Pasadena to be directed primarily to St. John Avenue in a southerly direction thence to its connection with Pasadena Avenue thence to Columbia Street and from Columbia Street westerly and easterly to Orange Grove Avenue, Fremont Avenue and Fair Oaks Avenue and thence southerly on said arterials into the City of South Pasadena.

43. Traffic which is channeled upon arterials can be better managed and controlled than traffic which is not channeled and controlled and is allowed to flow indiscriminately through residential streets.

44. The construction of the wishbone will tend to funnel this traffic upon arterials and to deter its flowing upon the local residential streets in an uncontrolled fashion.

45. The volume of traffic in South Pasadena after the opening of the Route 210 Freeway will be substantially increased even without the construction of the wishbone. South Pasadena will have a further increase of approximately 5,000 vehicles if the wishbone is constructed but such total increase of vehicles will be delivered directly to the arterials in South Pasadena where it could be managed and controlled and thus will flow more evenly with less congestion and impact. The bulk of such further increase will be oriented to the Orange Grove Avenue access to the Pasadena Freeway, a distance of approximately 1,800 feet in South Pasadena.

46. Traffic volumes are not the most significant factor in determining traffic impact and congestion. The management and control of traffic is of more significance.

47. The construction of the wishbone facility is necessary to provide safety for the citizens and residents of the communities of Pasadena and South Pasadena and it will reduce the hazards and traffic problems which otherwise will be aggravated following the opening of Route 210. The cost of construction of the wishbone is $157,000 but completion of Route 7 would be many millions of dollars more.

48. The cost of construction of the wishbone is also less than 0.3% of the cost of Route 210 contracts, of which it is an integral part. The majority of these contracts, of which the wishbone is a part, have been completed, and the construction of the wishbone is essential as "End of Freeway Construction" for the effective utilization of Route 210 and the "134/210/7 Interchange" and for the safety and general welfare of the southwesterly community in Pasadena.

49. If the Route 210 contracts are not completed as proposed by the construction of the wishbone facility, the City of Pasadena and the City of South Pasadena will bear impermissibly heavy traffic burdens compromising the quality of life and safety of the inhabitants. The construction of the wishbone facility will also relieve congestion around the Huntington Hospital that is anticipated with the opening of the 210 Freeway. It is preferred that traffic exit from freeways at known and controlled locations rather than the alternative of vehicles desiring to use the Route 7 corridor skipping along the Route 210 Freeway until they find an off-ramp which has a queue (line of stopped vehicles) that they are willing to wait in and then heading south on a number of streets only to become involved in heavy congestion due to heavy volumes of traffic joining these streets by a number of circuitous paths.

50. Dispersion of vehicles is expected to create severe traffic impacts on numerous City arterial and local neighborhood streets, with resultant detrimental effects upon traffic safety in the City with resultant noise, pollution and congestion in residential areas.

51. There are many serious environmental and livability impacts that occur when commuter traffic circulates on local residential streets—in particular minor local neighborhood streets that are not designed for the safe and efficient handling of through traffic. Traffic diversion to local residential streets is often found in situations where residential neighborhoods lie in the path between two large capacity regional highway systems that are located in close proximity to each other. These traffic diversion problems into local neighborhoods are particularly acute when there is no well-defined and adequate arterial system connected and balanced with the capacity available at the access points to the regional systems.

52. In order to provide safer neighborhoods and roads in the Route 7 Freeway corridor, a system must be established to manage and control traffic emerging from a regional highway system and attempting to connect with another regional highway system. There can be more success in providing for pedestrian and traffic safety on a

few arterial streets through proper application of standard traffic engineering techniques than can be achieved by trying to install control devices on neighborhood streets. The wishbone can be expected to lessen the amount of traffic infiltration onto local city streets and to improve living conditions and the safety of people on these streets. Such a minimal system could be established by allowing the modifications of the Stipulation and Order that are sought by City of Pasadena. These modifications will provide a safer road system and will mitigate adverse environmental impacts that will occur with the opening of the Route 210 Freeway in February of 1976.

53. Traffic attempting to connect with the westbound Pasadena Freeway will do so regardless of how traffic is controlled. The requested modifications will not substantially increase that amount of traffic. The system will organize the traffic in a safe and orderly manner.

54. Traffic attempting to make the connection with the Long Beach Freeway through the Route 7 corridor will not be substantially increased if the request is granted. The proposed modifications of the Stipulation will deliver that traffic flow in a manageable form at known locations.

55. Alternatives have been considered but no alternative traffic control system has been suggested that would offer a better immediate interim solution to the traffic problems that will be aggravated when the Route 210 Freeway is opened in February of 1976, when southwest Pasadena and South Pasadena will be inundated by regional traffic problems and those problems can be significantly mitigated by construction of the wishbone.

56. When the wishbone is constructed and implemented state defendants, Pasadena and South Pasadena will take whatever measures they feel necessary to reduce any adverse impacts on local streets intersecting the wishbone.

57. Construction of the wishbone will have no effect on the decision as to the ultimate freeway location and will not foreclose reasonable alternatives to the proposed ultimate Route 7 Freeway.

58. Matter herein expressed as a finding of fact which is later deemed to be a conclusion of law is hereby found as a conclusion of law. Similarly, any matter expressed as a conclusion of law, which is later deemed to be a finding of fact, is expressed as a finding of fact.

## CONCLUSIONS OF LAW

Based upon the Findings of Fact in this matter, the Court makes the following Conclusions of Law:

1. The Order of March 7, 1973, (see Appendix) heretofore issued by this Court pursuant to the Stipulation of the parties is in the form of a preliminary injunction.

■ 2. The Court retains jurisdiction and has inherent power to modify a preliminary injunction.

■ 3. There is no automatic right to an injunction under the National Environmental Policy Act (NEPA), Federal Aid to Highway Act (FAHA) or the California Environmental Quality Act (CEQA). The decisional process for this court is one of balancing the equities and it is often a most difficult task. [*Aberdeen & Rockfish R. R. v. Students Challenging Regulatory Agency Procedures*, 409 U.S. 1207, 1217–18, 93 S.Ct. 1, 34 L.Ed.2d 21 (1972)].

■ 4. Nothing in NEPA restricts a court from exercising its equity powers to fashion a decree meeting the needs of a particular case before the court. [*Environmental Defense Fund v. Armstrong*, 352 F.Supp. 50, 60 (N.D.Cal.1972); 356 F.Supp. 131, 134 (1973). Affirmed in *EDF v. Armstrong*, 487 F.2d 814 (9 Cir. 1973); cert. denied 416 U.S. 974, 94 S.Ct. 2002, 40 L.Ed.2d 564.]

5. The failure to modify the Order as requested will not prevent irreparable damage to the environment, but will result in adverse impacts upon the environment that will be mitigated by allowing the requested modifications. The continued enforcement of said Order would be a highly inequitable

function for an equitable remedy. [*Canal Authority of Florida v. Callaway*, 489 F.2d 567, 578 (5 Cir. 1974)].

6. The procedures under NEPA are lengthy and those procedures will not be completed in time to take interim measures to protect the public safety and welfare. The motions for modification of the Order provide good interim measures that are speedy enough to mitigate adverse environmental impacts and protect the public safety and welfare [*Dry Color Manufacturers Association v. Department of Labor*, 486 F.2d 98, 107–8 (3 Cir. 1973)].

■ 7. A trial court has discretion to balance the equities and determine whether the work on an entire project must be halted pending a completion of an Environmental Impact Statement (EIS) under NEPA and CEQA and may balance the equities and issue a partial injunction as distinguished from a blanket injunction when it is necessary to allow a portion of the project to be completed, when failure to do so would pose an imminent threat to the public safety or welfare and where the threat cannot be temporarily allayed by other means. [*Vermont Natural Resources Council v. Brinegar*, 508 F.2d 927 (2d Cir. 1974), *State of Ohio v. Callaway*, 497 F.2d 1235 (6 Cir. 1974)].

■ 8. Although the general rule is that the courts will not enjoin the declared policies of Congress as expressed in NEPA and FAHA [*Lathan v. Volpe*, 455 F.2d 111 (9 Cir. 1971), *Lathan v. Brinegar*, 506 F.2d 677 (9 Cir. 1974)], the Ninth Circuit has recognized that under unusual circumstances, the weighing of the equities is proper and necessary in order to determine whether an injunction should be issued so as to require full compliance with NEPA before allowing phases of a project to be performed [*Alpine Lakes Protection Society v. Schlapfer*, 518 F.2d 1089, (9 Cir. 1975)].

■ 9. The court has the power and discretion, after a balancing of the equities, to allow a portion of a project to be performed even though the provisions of NEPA and CEQA have not been met fully, where such

partial work upon the project is necessary for the protection of the public interest and the halting of the project in its entirety will pose a threat to the public welfare and safety of the inhabitants of a community. [*Sansom Committee v. Lynn*, 382 F.Supp. 1242 (E.D.Pa.1974), *Environmental Defense Fund v. Froehlke*, 477 F.2d 1033 (8 Cir. 1973)].

■ 10. The Route 7 Freeway to Del Mar Avenue in Pasadena as well as the Route 210 and Route 134 connector roads to and from Route 7 are complete at a cost of $13,300,000. There is a very remote possibility that these facilities will be eliminated or remain unused. These facilities together with the wishbone will relieve the local streets of an increase in traffic in Pasadena and South Pasadena, which increase in traffic would otherwise occur when Interstate 210 is opened to traffic. Further the construction and implementation of these facilities will result in a betterment to the public health and welfare since they will result in a generally more safe condition on the local streets in Pasadena and South Pasadena. If the wishbone is not constructed and implemented, the quality of life in Pasadena and South Pasadena and the safety of the residents of Pasadena and South Pasadena will be compromised.

11. The 210 Project is substantially completed and any substantial adverse effect upon the environment by allowing the construction of the wishbone is negligible as compared to the need for correcting a dangerous street and traffic situation [*Public Interest Research Group of Michigan (PIR-GIM) v. Brinegar*, 517 F.2d 917, 918 (6 Cir. 1975)].

12. The wishbone is an interim facility and will be replaced when the Route 7 Freeway is constructed. There has been no evidence presented which would accomplish the same objectives as the wishbone but which would have less adverse impacts on Pasadena and South Pasadena.

13. The construction and implementation of Route 7 and the wishbone does not involve significant adverse environmental

effects. State defendants and Pasadena will take whatever measures, they deem necessary to mitigate any adverse effects. Further, South Pasadena can take measures in the form of implementing traffic control devices to mitigate any adverse effects.

14. State defendants, South Pasadena and Pasadena are authorized to alleviate any impacts from the newly constructed and opened facilities and cooperate in all ways possible to reduce any adverse impacts. The parties are further instructed not to delay the preparation and processing of the EIS to assure that this solution is an interim solution.

15. It is in the public interest that wishbone be constructed and that the completed facilities within the Route 7 corridor be opened to traffic. The balance of irreparable damage is in favor of granting the requested modifications. The public interest will be served by granting the requested modifications so that traffic can be routed to arterial streets rather than inundating and spreading through residential neighborhoods and streets that were not designed to handle such traffic. [*Alpine Lakes Protection Society v. Schlapfer*, 518 F.2d 1089 (9 Cir. 1975)].

16. The Draft Environmental Impact Statement (DEIS) contains a reasonably complete analysis of the environmental impacts of the construction of the wishbone to traffic as well as the impacts of the opening of Route 7 and the wishbone to traffic. The DEIS was duly circulated in accordance with law and public input by way of comments was received concerning the contents of the DEIS. The contents of the DEIS were discussed at six community workshops in the cities of Alhambra, Los Angeles, South Pasadena and Pasadena. South Pasadena submitted its comments to the DEIS but these comments made no reference to the wishbone.

17. There have been changed circumstances since the Order was entered sufficient to justify the exercise of this Court's discretion to amend said Order. Said changed circumstances were not anticipated by the parties herein.

18. Intervenor City of Pasadena was not a party to the complaint that was filed in this action, has not created any delays in the preparation of the EIS, and will be seriously injured if the Stipulation and Order is not modified as requested. Intervenor City of Pasadena is blameless and should not bear the burdens of delays caused by others.

19. The order of March 7, 1973, made pursuant to stipulation of parties allows the construction of the wishbone facilities upon the happening of certain events, and it was contemplated by the parties that such events would occur prior to the opening of the 210 Freeway. The opening of 210 Freeway will aggravate traffic problems in the City of Pasadena, but the City of Pasadena has not had any control over the timing of the events which are the conditions contained within the Stipulation and Order.

20. A balancing of the equities makes it apparent that harm should not be imposed upon Pasadena merely for the sake of conforming to an outmoded timetable. The court has weighed the equities herein and has determined that any further delay in the construction of the wishbone and the opening of Route 7 to traffic will result in irreparable harm to the residents of Pasadena without any significant benefits to South Pasadena. Whether these acts are or are not accomplished will have no significant impact on South Pasadena. Under the Stipulation and Order herein the acts here under consideration will be accomplished. Denial of the *motions for modification* would merely delay these acts beyond that time contemplated by the parties at the time of execution of the Stipulation. Such delay would not alter the construction or its impacts. As a result of opening Interstate 210 to traffic, the construction of the wishbone and the opening of Route 7 to traffic is of great urgency.

21. The Motion to Intervene by Concerned South West Residents of Pasadena is denied because their interest is adequately represented by existing plaintiffs herein; further, said motion was not timely because the proposed Complaint in Intervention of

said Concerned South West Residents of Pasadena concerns itself with the location of the proposed Route 7 Freeway from Valley Boulevard to the 134/210/7 Interchange, as well as the proposed Route 7 Freeway itself. Neither the location of the proposed Route 7 Freeway nor the proposed Route 7 Freeway itself is in issue in the motions by state defendants and Pasadena. The aforementioned proposed Complaint in Intervention does not refer to the interim facilities as described hereinabove.

22. By reason of the anticipated opening of the Route 210 Freeway within the City of Pasadena, Paragraphs 5 and 9 of said Order of March 7, 1973 should be amended to allow construction of the enjoined work that has been under contract since 1972 and allow the use of the completed facilities.

23. State defendants' Motion for Order Amending the Stipulation and Order Concerning Actions To Be Taken with Respect to the Proposed Long Beach Freeway Project and Pasadena's Motion to Modify are hereby granted.

24. Matter herein expressed as a Conclusion of Law which is later deemed to be a Finding of Fact hereby is found as a Fact and any matter expressed herein as a Finding of Fact which later is deemed to be a Conclusion of Law hereby is expressed as a Conclusion of Law.

APPENDIX

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF SOUTH PASADENA, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>JOHN A. VOLPE, et al.,<br><br>Defendants. | CIVIL NO. 73–81–EC<br><br>STIPULATION AND ORDER CONCERNING ACTIONS TO BE TAKEN WITH RESPECT TO THE PROPOSED LONG BEACH FREEWAY PROJECT |

It is hereby stipulated and agreed by and between the undersigned attorneys for plaintiffs and attorneys for the California Highway Commission, the California Department of Public Works, James A. Moe and Robert Datel, hereinafter referred to as the "state defendants", as follows:

1. State defendants shall prepare an environmental impact report complying with the provisions of Section 102(2)(c) of the National Environmental Policy Act, 42 U.S.C. § 4332(2)(c) and Section 21100 of the California Environmental Quality Act, Calif.Pub.Res. Code § 21100, in connection with that portion of the proposed Long Beach Freeway project, State Highway Route 7, between the San Bernardino Freeway and the interchange of Route 134, Route 210 and Route 7 in the City of Pasadena. Construction of the proposed Long Beach Freeway project has not yet been completed between Valley Boulevard in the City of Los Angeles to said interchange in the City of Pasadena (this uncompleted portion is hereinafter referred to as the "project"). It is anticipated that the draft environmental impact report will be completed in early 1974. Thereafter, state defendants shall hold a public hearing, or hearings, as set forth in paragraph 3, *infra*, and the final environmental impact report shall be prepared following said public hearing or hearings.

2. The environmental impact report shall include a complete consideration of alternatives to the project, including the alternative of not completing the project and the alternative of not opening to traffic that portion of the project constructed pursuant to the provisions of paragraph 5, *infra*. Moreover, the environmental impact report shall specifically identify and consider the environmental effects and adverse impacts of:

APPENDIX—Continued

(a) completing the project only to the north and south boundaries of the City of South Pasadena, and

(b) of opening to traffic that portion of the project constructed pursuant to the provisions of paragraph 5, *infra.*

3. After preparing the draft environmental impact report, state defendants shall hold a public hearing or hearings in accordance with the provisions of Policy and Procedure Memorandum 20–8 of the Federal Highway Administration (hereinafter referred to as "PPM 20–8"). Said public hearing or hearings shall be held in the City of Pasadena or in the City of South Pasadena. At this time no agreement has been reached between plaintiffs and state defendants as to whether the corridor hearing and the design hearing required by PPM 20–8 must be held as separate hearings or whether they may be combined into a single hearing. At least one hearing is now required by this stipulation and an additional hearing may be required by future court order or agreement by and between the parties. It is anticipated that the public hearing (or the first of the public hearings if more than one is held) will be held in mid-1974.

4. No further construction, except that explicitly allowed in paragraph 5, *infra,* shall be undertaken on the project during that period of time between the approval of this agreement by the Court and the final approval of the environmental impact report by the United States Department of Transportation or other appropriate federal agency following the conclusion of the public hearing or hearings held as provided in paragraph 3, *supra.* For purposes of this stipulation, this period shall be known as the "interim time period".

5. The only construction permitted on the project during the interim time period shall be the completion of work already contracted for by state defendants between the interchange of Route 134, Route 210 and Route 7 in the City of Pasadena and Columbia Street.

6. No property or structures shall be acquired by state defendants in connection with the project during the interim time period, except as follows:

(a) In the City of South Pasadena, state defendants may acquire property in hardship or protective cases in accordance with the provisions of Section 100.21 of the California Streets and Highways Code; provided that state defendants must give the City Attorney of the City of South Pasadena ten days notice prior to any such acquisitions.

(b) Outside the City of South Pasadena, state defendants agree that during the interim time period they shall not engage in an active right of way acquisition program and shall not acquire any property except in cases where the owners freely and voluntarily request state defendants to acquire their property. From time to time during the interim time period, state defendants agree to furnish plaintiffs' attorneys information and data with respect to the number and location of property acquired by state defendants upon request.

7. State defendants shall not remove or demolish any structure in connection with the project during the interim time period, except such structures as may be hazards to public health and safety. In order to prevent vacant structures from becoming public health and safety hazards, state defendants shall use their best efforts to rent all structures to be acquired in connection with the project.

8. State defendants shall use their best efforts to maintain all property and structures they have acquired in connection with the project and shall not grade, remove trees, relocate public utilities or perform other similar work in connection with the project; provided that state defendants shall not be prohibited from undertaking necessary work to prepare the environmental impact report.

9. No traffic shall be permitted on that portion of the project constructed pursuant to the provisions of paragraph 5, *supra,* until the completion of the interchange of Route 134, Route 210 and Route 7 in the City of Pasadena.